UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE D., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>KILOLO KIJAKAZI, )<br>Acting Commissioner of the Social )<br>Security Administration, )<br>)<br>Defendant. ) | Case No. 4:22 CV 432 JMB |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

**I. Procedural History**

On January 27, 2020, Plaintiff Jacqueline D. filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*. (Tr. 246-247). She alleged that she became disabled on June 12, 2017 because of various conditions including autoimmune disease, Sjogren syndrome, nerve pain, migraines, back conditions, and brain fog (Tr. 156). Plaintiff later amended her onset date to July 30, 2019 (Tr. 258). After Plaintiff's applications were denied on initial consideration and reconsideration (Tr. 155, 165-177), she requested a hearing before an Administrative Law Judge (ALJ) (Tr. 240-242).

Plaintiff and counsel appeared for a hearing on April 6, 2021 before the ALJ. (Tr. 111-154). Plaintiff testified concerning her disability, daily activities, functional limitations, and past

work. The ALJ also received testimony from vocational expert Delores Gonzalez, M.Ed. The ALJ issued a decision denying Plaintiff's application on July 29, 2021 (Tr. 33-52). The Appeals Council denied Plaintiff's request for review on February 17, 2022 (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born in October, 1962 and was 56 years old on the alleged amended onset date (Tr. 156). She lives in house with her family (Tr. 295). She has at least a college education (Tr. 274). Throughout her career with the City of St. Louis, Plaintiff made significant income, including over $60,000 in both 2018 and 2019, but had no income in 2020 and 2021 (Tr. 252).

Plaintiff listed her disabling impairments as autoimmune disease, Sjogren syndrome, nerve pain, migraines, back conditions, brain fog, joint pain, extreme tiredness, anxiety and depression, and eye issues (Tr. 273). As of January 2020, Plaintiff's medications included Butalbital-Acetaminophen-caffeine (for migraines), Cyclobenzaprine (for muscle spasms), Hydroxychloroquine (for autoimmune disease), Pregabalin (for nerve pain), Sertraline (for anxiety and depression), and Tramadol (for pain) (Tr. 276).

Plaintiff's February, 2020 Function Report states that she suffers from jolts of volatile, extreme, unpredictable and embarrassing pain and migraines that are not resolved by medication (Tr. 315. 319). She manages most of own self-care but is limited because of numbness and needs assistance with certain tasks (Tr. 316). She cooks simple meals, drives, shops for groceries, does light chores, completes paperwork, pays bills, and uses a computer when she can (Tr. 316). However, she can no longer walk for 30 minutes straight or participate/assist at church with videography and writing (Tr. 316). While she attends church weekly and socializes there, she

otherwise limits her time outside and socially because she needs to sleep, has pain, and doesn't like others seeing her pain (Tr. 319). As to her functional limitations, she has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, concentrating, completing task, and using hands but not with talking, hearing, understanding, following instructions, and getting along with others (Tr. 320). She wears glasses and uses a wrist brace (Tr. 321). Plaintiff's medications make her drowsy (Tr. 321). Plaintiff's husband filled out a third-party Function Report in which he mirrored much of Plaintiff's self-assessment (Tr. 295-302).

Plaintiff testified at the April 2021 hearing that she has a Bachelor's degree in computer science and an Associate's degree in liberal arts (Tr. 122). Immediately after she stopped working, she tried to find new employment but was unsuccessful (Tr. 123-124). She currently collects unemployment benefits (Tr. 124-125). She testified that lupus flares, pain, lack of concentration, and brain fog prevent her from working (Tr. 125). In describing her pain, she states that it is unexpected and intense, that it can occur anywhere in her body, that it causes her to stop what she is doing and yell out in pain (Tr. 125). She states that she can do nothing until the pain stops (Tr. 126). The pains happen every day and occur at different times in the day (Tr. 126). She also feels fatigued from lupus and has trouble getting moving in the morning (Tr. 126). She has lupus flares, which occur monthly and last for two to two-and-a-half weeks, that cause fatigue and soreness; they are not relieved by medication (except steroids which help her "get through a day") and the medication she does take cause nausea and tiredness (Tr. 129). In addition, she has brain fog, is forgetful and has trouble staying on-task, has migraines, and vision issues (Tr. 127, 130, 131). During the day, she sometimes stays in bed and reads (Tr. 128). Plaintiff's testimony appears to show that she cannot do various things, like picking things up from the floor or laundry or that she

can only do a things for no more than 10 or 15 minutes, including sitting, standing, walking, using her hands, chores, and personal care (Tr. 130-139).

Vocational expert Delores Gonzalez testified that Plaintiff's past work as a deputy director, information technology coordinator, and programmer analyst are classified as sedentary and skilled (Tr. 144).[1] Ms. Gonzalez was asked to testify about the employment opportunities for a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level with the following additional limitations: occasionally climb ramps and stairs; avoid climbing ladders, ropes or scaffolds; avoid extreme cold, extreme heat, and hazards such as unprotected heights and moving mechanical parts; can frequently handle, finger, and feel with bilateral extremities; have occasional exposure to concentrated fumes, odors, dusts, gases and poorly ventilated areas; and avoid working in a loud environment (sensitivity level 4 and higher) (Tr. 145-146) . According to Ms. Gonzalez, such an individual would be able to perform Plaintiff's past work as deputy director, information technology coordinator, and programmer analyst (Tr. 146).

Ms. Gonzalez further testified that if the hypothetical were modified to state that the person could only work at a sedentary level, then all jobs, except information technology coordinator if performed at a medium level, would be available (Tr. 146). Ms. Gonzalez went on to testify about potential jobs if the hypothetical were modified to include the following additional limitations: perform simple, routine tasks with minimal changes in job duties and job setting, avoid fast-paced production type work. Ms. Gonzalez indicated that Plaintiff could not perform her past work with these additional limitations (Tr. 147-147).

---

[1] Ms. Gonzalez indicated, however, that the information technology coordinator is classified as medium, as performed (Tr. 145).

When questioned about additional limitations, Ms. Gonzalez indicated that full time employment would not tolerate unscheduled breaks and off-task behaviors in excess of 10% of the workday, and that other requirements, like dim lighting or low noise level, would require an accommodation (Tr. 147-151).

### B. Medical and Opinion Evidence

The records reveal that Plaintiff was treated for pain and other conditions by Dr. Steven B. Livingstone, her primary care physician, beginning on January 28, 2019 (Tr. 373). He prescribed Tramadol for pain, ordered an x-ray, and referred her to physical therapy (Tr. 373). Plaintiff attended a number of physical therapy sessions in February and March 2019 (Tr. 587-633). On March 12, 2019, she presented with a headache (Tr. 380). Dr. Livingston noted that she suffered from tension headaches before but that her current symptoms appeared to indicate a migraine headache – as such, he prescribed Floricet (which is butalbital-acetaminophen-caffeine) with a referral to a neurologist (Tr. 380-381). Plaintiff was seen by neurologist, Dr. Siddharth Kaul, on April 12, 2019 (Tr. 536). Dr. Kaul noted that Plaintiff appeared anxious, stressed out, and probably does not sleep well (Tr. 537). The doctor found that she was tired, fatigued, had headaches, had body pain, and was anxious and depressed, among other things (Tr. 539). Physically, she appeared normal as to strength, walking, fine finger movements and sensation (Tr. 539-540). Dr. Kaul did not prescribe medications because he believed that her symptoms were caused by stress and lack of sleep – he ordered imaging to rule out a brain dysfunction (in light of lupus) and suggested psychotherapy (Tr. 540).

At the next encounter with Dr. Livingstone on June 10, 2019, Plaintiff presented with a persistent cough and Dr. Livingstone found that she was fatigued with morning joint stiffness, swelling, and pain (Tr. 387). Plaintiff went to the Emergency room on July 30, 2019 (the amended

onset date) with migraine pain (the notes indicate that she did not take medication for migraines) (Tr. 523-531) and followed up with Dr. Livingstone on August 7, 2019 (Tr. 396). He again found that she exhibited signs of fatigue but no physical abnormalities (Tr. 397). She was prescribed Methylprednisolone (for some nasal/smell issues) and Sertraline (Zoloft) (Tr. 397-398).

At a follow-up appointment on February 21, 2020, her diagnosis included depression with anxiety and "intractable migraine with aura with status migrainosus" (Tr. 454). Her physical examination was largely normal and she was not in distress except that she was positive for headaches (Tr. 456); Dr. Livingston added Cymbalta (Tr. 457). Six weeks later, on April 3, 2020, Plaintiff presented with headaches, numbness in hands, and high blood pressure (Tr. 461). Dr. Livingston noted that she was doing well with Cymbalta but she was positive for fatigue, joint and muscle pain, and had a depressed mood with anxiety (Tr. 463). He further noted that she was stable on her psychiatric medication and she was prescribed Losartan (for hypertension) (Tr. 464). At some point, Dr. Livingston referred Plaintiff to a neuromuscular clinic.

For her connective tissue disease, Sjogren's syndrome,[2] neuropathy, and autoimmune conditions, Plaintiff was being treated by Dr. Mehwish Bilal, a rheumatologist (Tr. 469-488). At a 3-month follow-up appointment on September 20, 2018,[3] Plaintiff complained of worsening pain and shooting pain "from time-to-time" and "intermittent morning stiffness" (Tr. 404). She had

---

[2] "Sjogren's Syndrome is a chronic (long-lasting) autoimmune disorder that happens when the immune system attacks the glands that make moisture in the eyes, mouth, and other parts of the body. The main symptoms are dry eyes and mouth, but other parts of the body may be affected as well, with many people reporting fatigue and joint and muscle pain. In addition, the disease can damage the lungs, kidneys, and nervous system. Sjogren's syndrome predominantly affects women." *Sjogren's Syndrome,* NATIONAL INSTITUTE OF HEALTH, https://www.niams.nih.gov/health-topics/sjogrens-syndrome (last visited August 22, 2023).

[3] Dr. Bilal indicated that Plaintiff was "here for management of positive ANA and numbness and tingling" (Tr. 403). A positive ANA test "indicates that your immune system has launched a misdirected attack on your own tissue – in other words, an autoimmune reaction." *ANA test, overview,* MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/ana-test/about/pac-20385204 (last visited August 22, 2023).

previous complaints of tingling and numbness in her lower extremities, that had lasted for a year but that had worsened in the past 3-4 months, and her hands, in the right more than the left (Tr. 403). She also complained of shooting pains in her extremities that lasted 1-2 minutes but resolved by themselves. And, she had "[o]n and off [ ] morning stiffness but nothing significant" (Id.). At the previous appointment, a prescription of Gabapentin was increased; however, Plaintiff had a difficult time taking three doses of the drug per day. Upon examination, she appeared to be in no distress, had normal range of motion, and no edema, tenderness, or deformity (Tr. 405). Dr. Bilal noted that she was doing well on Plaquenil (Hydroxychloroquine) for her connective tissue disease, Lupus/Sjogren, and that she would continue Gabapentin (Tr. 407). Dr. Bilal directed a follow-up in 6 months (Tr. 407).

At that follow-up visit on March 12, 2019, and subsequent follow-ups on September 10, 2019, January 20, 2020, June 22, 2020, November 6, 2020, and February 24, 2021, the doctor's history, physical examination findings, and diagnosis are practically identical to the previous September, 2018 encounter (Tr. 413, 414, 417, 424, 425, 435, 436, 660, 670, 680).[4] There were some changes to Plaintiff's course of treatment; Gabapentin was tapered off and she was started on Lyrica at the September 10, 2019 appointment (Tr. 428), she was referred to a hand surgeon for potential carpal tunnel syndrome on January 20, 2020 and June 2020 (Tr. 439,665), and in June 2020, it was noted that she stopped taking Lyrica and started on Cymbalta (Tr. 660). In November, 2020, Dr. Bilal stated that labs indicated that her inflammation was worsening and that her pain is an on-going issue – he advised her to apply for disability benefits (Tr. 674). The February 2021 report inconsistently states that labs indicate her inflammation is worsening and improved (Tr.

---

[4] During the COVID-19 pandemic, the June and November, 2020 examinations were conducted by video-conference (Tr. 660, 670). Plaintiff also saw Dr. Bilar on June 6, 2021 by video-conference; it was noted that Plaintiff had no gross swelling or new deformities, that Plaintiff was taking Cymbalta and not Lyrica (Tr. 59, 61).

684).  But, at that appointment (which was in person), Dr. Bilal found that Plaintiff had normal range of motion (as to her neck), was in no distress, but that her pain was ongoing (he again suggested that she apply for disability benefits) (Tr. 682, 684)

After referrals from both Drs. Livingston and Bilal, Plaintiff was evaluated by Drs. Collin John Kreple and Muhammad Taher A Al-Lozi on June 18, 2020 (Tr. 472).  Dr. Kreple noted Plaintiff's complaints of pain throughout her body, weakness, and fatigue with significant exacerbation in 2020 due to "social stressors" (Tr. 472).  She did not appear to be in distress at the appointment and her physical examination was normal except for vibration testing (Tr. 473-474).  Dr. Krepel believed that Plaintiff's symptoms were due to small fiber neuropathy (Tr. 474).  After various studies, it was determined that she had mild carpal tunnel syndrome on the right, but that there was insufficient evidence of carpal tunnel syndrome on the left, ulnar neuropathy, large fiber peripheral polyneuropathy, and small fiber neuropathy could not be ruled in or out (Tr. 478). Plaintiff was treated for "notable bilateral carpal tunnel syndrome" on August 25, 2020 (Tr. 701) by Dr. S. Vic Glogovac, who had previously treated for a "right trigger thumb" on October 24, 2017 (Tr. 699).  It is unclear from the records (the handwritten notes are unreadable and the typed notes are uninformative) how successful the treatment was and there is no indication that Plaintiff received further treatment for carpal tunnel syndrome.

Subsequent testing in December 2020 suggested that Plaintiff had obstructive sleep apnea (Tr. 643).  On February 1, 2021, Plaintiff presented to Dr. Livingston with right elbow pain and right-hand trigger finger and she was referred to physical therapy (Tr. 558).  Plaintiff attended two

sessions of physical therapy (Tr. 566-582). She received corticosteroid injections for trigger finger in March 2021 (Tr. 723).

Shortly after seeing Dr. Livingstone on February 1, 2021, Plaintiff established care with Dr. Arlan Markollari (Tr. 715). On February 19, 2021, she complained of "multiple medical issues" including neuropathic pain that occurred in different parts of her body for four seconds and that was not triggered by anything (Tr. 715). Upon examination, Dr. Markollari found that she had normal range of motion – he believed her pain may be related to her autoimmune condition or her medications and he prescribed Lyrica (Tr. 716). She returned to Dr. Markollari on March 29, 2021 (Tr. 718). At this examination, he noted that she had been "struggling" in the past few months with sharp and debilitating pain, fatigue, and stiffness and had difficulty with her activities of daily living (Tr. 718). Upon examination, she was positive for fatigue, back pan, gait problems, joint swelling, and neck pain (Tr. 718). She had swelling and tenderness in her wrists and hands and decreased range of motion in her hands and back (Tr. 719). Dr. Markollari recommended that she follow up with rheumatology as to her pain, stiffness, and discomfort and did not otherwise order additional treatment (Tr. 719).

Plaintiff then sought treatment at Arch Advanced Pain Management in April and May 2021 (Tr. 731). At that time, she reported neck, back and joint pain, headaches, and muscle weakness (Tr. 737). A physical examination revealed that she was not in acute distress; however, she had limited range of motion in her neck, a stiff cervical spine, normal range of motion in her hips, abnormal gait, negative straight leg raising, and normal strength (Tr. 737). It is unclear what treatment was ordered (it appears that she was told to increase her dose of Lyrica if needed), but Plaintiff was directed to follow up weekly and then monthly (Tr. 739, 765). Plaintiff continued care at Arch Advanced Pain Management after the ALJ issued her opinion (Tr. 13-24). In those

records, which include encounters from June-August, 2021, Plaintiff symptoms are similar and the treatment appears to be increasing her Lyrica dosage (Id). She also followed up with Dr. Markollari on August 18, 2021 with similar complaints of sharp and random pain throughout her body, stiffness, and fatigue (Tr. 29-30). Dr. Markollari recommended continuing her current treatment, using cold packs, analgesics, muscle relaxers, use of NSAIDs, exercise, and physical therapy with additional diagnostics if no relief is achieved (Tr. 31).

Two agency doctors evaluated Plaintiff's disability and functional limitations in April, 2020 and October 2020 (Tr. 156-164; 166-177). The second evaluation, conducted by Dr. Donna McCall, found that Plaintiff could perform her past relevant work with certain exertional, postural, and environmental limitations (Tr. 166-177). This evaluation will be discussed below in greater detail.

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary

sufficiency is not high." Id.  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above (Tr. 36-47). The ALJ found that Plaintiff met the insured status requirements through December 31, 2024, and had not engaged in substantial gainful activity since July 30, 2019, the (amended) alleged onset date (Tr. 38). At step two, the ALJ found that plaintiff had the severe impairments of lupus, Sjogren's syndrome, degenerative disc disease, clinical obesity, obstructive sleep apnea, and a history is bilateral carpal tunnel syndrome with mild right carpal tunnel syndrome (Tr. 38).

The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (Tr. 40). The ALJ specifically addressed listing 1.15, 1.16, 14.02, 14.06, and 11.14 (Tr. 40-41). Plaintiff does not challenge the ALJ's assessment of her severe impairments or his determination that Plaintiff's impairments do not meet or equal a listing.

The ALJ next determined that Plaintiff had the RFC to perform light work, except that she should avoid climbing ladders, ropes or scaffolds, that she could occasionally climb ramps and stars, that she should avoid extreme cold, extreme heat, and hazards such as unprotected heights and moving mechanical parts, that she could frequently handle, finger, and feel with her bilateral upper extremities, that she could have occasional exposure to concentrated fumes, odors, gases, dust, and poor ventilation, and that she should avoid working in a loud noise environment (a noise intensity level of 4 and louder (Tr. 41). In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from Plaintiff; Plaintiff's work history; and Plaintiff's testimony regarding her abilities, conditions, and activities of daily living. (Tr. 41-46). Plaintiff asserts that the ALJ improperly assessed her subjective complaints of pain and that the RFC is not supported by substantial evidence.

At step four, the ALJ concluded that Plaintiff is capable of returning to her past relevant work as an information technology coordinator, that is sedentary exertion but performed up to a medium exertion, and a programmer analyst (Tr. 46). Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from July 30, 2019 to July 29, 2021 — the date of the decision. (Tr. 47).

## V. Discussion

Plaintiff argues that the RFC is not supported by substantial evidence.

A claimant's RFC is the most she can do in a work setting despite her limitations. Schmitt v. Kijakazi, 27 F.4th 1353, 1360 (8th Cir. 2023) (citing 20 C.F.R. § 404.1545(a)(1)). When determining a claimant's RFC, the ALJ must consider "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of [her] limitations." Papesh v. Colvin, 786 F3d 1126, 1131 (8th Cir. 2015) (citations and quotation marks omitted). Thus, the ALJ must consider the claimant's prior work record and third-party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is not obligated to mechanically discuss each of the above factors; however, when rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his or her reasons for discrediting the testimony, and the ALJ's credibility assessment must be based on substantial evidence. Vick v. Saul, No. 1:19 CV 232 CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Grba-Craghead v. Astrue, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)). On review by the court, "[c]redibility determinations are

the province of the ALJ." Nash v. Comm'r, Soc. Sec. Admin., 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016)).  The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility." Id.

Plaintiff argues that the ALJ did not explain how the objective medical findings affected Plaintiff's subjective complaints and that the ALJ impermissibly assessed Plaintiff's RFC based on raw medical findings (Doc. 20, p. 4).  In particular, she argues that the ALJ found Dr. McCall's opinion persuasive but that the RFC differed from Dr. McCall's opinion with no explanation (Id. 6).  She further argues that the ALJ failed to appropriately consider the phrase "in no acute distress" in the medical records in relation to her claims of disabling pain, erroneously discounted the findings of Dr. Markollari, which she argues are consistent with the record, improperly relied on medical findings during appointments conducted by video conferencing, did not appropriately consider Plaintiff's statements of fatigue which are consistent with her autoimmune diagnosis, and did not  consider all of the Polaski factors (Id. 9-14).

From the record before the Court, it seems clear that Plaintiff is struggling with symptoms that are causing a significant interruption in her life and that her condition(s) may be increasingly debilitating.  It also appears that some of her medical providers may not have accurately captured her complaints and symptoms, as seen in Dr. Bilal's near identical records.  However, there is substantial evidence in the record before the ALJ to support a finding that Plaintiff was not disabled during the relevant time period, even if this Court were to come to a difference conclusion.  See McNamara v. Astrue, 590 F.3d 607-610 (8th Cir. 2010) (stating that the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome" if substantial evidence supports the Commissioner's decision).

In considering Plaintiff's medical condition and the effects on her function, the ALJ first outlined Plaintiff's own statements of her functional limitations (Tr. 42). The ALJ recounted Plaintiff's testimony regarding the sudden and severe onset of pain, the ineffectiveness of her medications, her difficulty with personal care, fatigue, her difficulty sitting, standing, and walking, and her postural and manipulative limitations (Tr. 42). The ALJ also set forth Plaintiff's statements about the effect on her daily life, including difficulty using her hands, getting out of bed, lifting and holding objects, and performing chores (Tr. 42). However, the ALJ stated that Plaintiff's statements are inconsistent with "findings in the longitudinal record" and that her statements of being debilitated for days is inconsistent with regular statements in the medical records that she did not appear to be in apparent distress (Tr. 42-43).

In addressing the medical record, the ALJ noted that Dr. Bilal regularly found Plaintiff to have no musculoskeletal abnormalities and normal range of motion with no distress (Tr. 43). These findings were made when Dr. Bilal saw Plaintiff in person and through video-conferencing.[5] The ALJ further found that Dr. Livingstone found no abnormalities and a normal physical examination in February and April 2020 (Tr. 43). In June 2020, Dr. Kreple found some diminished vibratory sensation, but otherwise Plaintiff had a normal physical examination; and while he suspected small fiber neuropathy, testing did not bear out the diagnosis (Tr. 43). A consultive physical examination by Dr. Nicholas Smith in October, 2020 further noted that Plaintiff was not in acute distress, and while she had a reduced range of motion, she had full strength, no deformities, and could perform all functional testing (Tr. 44, 516-517). And, the ALJ found that records from

---

[5] Plaintiff points to no case authority that would suggest that video-conference examinations have limited weight or that the ALJ must acknowledge that the examinations were by video-conference (Doc. 20, p. 10). In any event, there is no suggestion that the ALJ relied exclusively on these examinations; and, the ALJ found that the examinations (by Dr. Bilal) were largely similar and consistent notwithstanding that some were conducted by video-conference.

Arch Advanced Pain Management showed limited range of motion in her neck and gait issues but also showed normal range of motion in her hips and lower back, normal muscle tone, and normal motor strength in her extremities in mid-2021.  Thus, the ALJ concluded that Plaintiff's "physical examinations have typically shown her to appear in no distress and to have full strength and largely normal musculoskeletal findings" (Tr. 45).

In coming to this conclusion, the ALJ did refer to Dr. Markollari's March, 2021 findings of decreased strength and range of motion but found that these findings were not indicated by other providers and represent "outlier or exception[s]" to her otherwise normal physical examinations (Tr. 45).  Certainly, there is evidence in the record that is consistent with Dr. Markollari's findings, as pointed out in Plaintiff's brief, however, the bulk of the evidence during the relevant time period demonstrate normal range of motion, tone, and strength.

In her functional report and at the hearing, Plaintiff described her condition as dire and that she was incapable of performing any functional movement for more than a few minutes without pain or fatigue.  As pointed out by Plaintiff, lupus, can cause such symptoms.  The ALJ, however, is not tasked with outlining conditions but in determining how those conditions affect function.  Thus, at each medical appointment, some lasting an hour, there is no indication that she was distressed or incapable of participating because of her physical condition.  Certainly, the ALJ cannot discount Plaintiff's complaints based solely on the medical evidence; however, the ALJ can discount Plaintiff's statements based on the evidence as a whole.  Koch v. Kijakazi, 4 F.4th 656, 664 (8th Cir. 2021); Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005).  In finding that Plaintiff's statement of debilitating pain and fatigue was not supported, the ALJ did not just rely of statements that she was not in distress at medical appointments; instead the ALJ also noted that rheumatology treatments predated her alleged onset date (and while she was working); there were

multiple normal physical examinations; there was a lack of clinical sources for her pain, i.e. neuropathy; Plaintiff was able to perform functional tests; limited physical therapy; lack of recurrence of limiting headaches; and, helpful medication. When the ALJ gives good reasons for discounting Plaintiff's statements of disabling conditions, the decision will not be disturbed. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

In his decision, the ALJ found that the opinions of agency Drs. Bland and McCall "largely persuasive" (Tr. 46). The ALJ noted that the doctors found that Plaintiff could perform a range of light exertional work and the Dr. McCall included postural and environmental restrictions, that their opinions were supported by narrative explanations and citation to the record. The ALJ further found that additional evidence was consistent with Dr. McCall's opinion (Tr. 46). As noted by Plaintiff, the ALJ did not reconcile differences between Dr. McCall's statement of Plaintiff's limitations[6] and the RFC that he adopted nor did he discuss each piece of medical evidence cited by the doctors. On one hand, Plaintiff argues that the ALJ should have explained the greater limitations that he found (i.e. that he did not entirely rely on Dr. McCall's findings); and, on the other, argues that the ALJ should not have relied on Dr. McCall's findings. Certainly, an ALJ should not rely entirely on an agency doctor's RFC that is not based on the entire record or that is beyond the doctor's area of expertise. See Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001); Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995). In this case, however, there is no suggestion

---

[6] Dr. McCall indicated that Plaintiff could occasionally climb ladders, ropes, and scaffolds (Tr. 173); whereas the ALJ found that Plaintiff should avoid the same (Tr. 41). Dr. McCall found that Plaintiff was unlimited in climbing ramps and stairs; the ALJ found that she could occasionally do the same. Dr. McCall found that Plaintiff had no restrictions in environmental conditions except that she should avoid concentrated exposure to cold, heat, and hazards. The ALJ found that Plaintiff should avoid extreme cold, extreme heat, and hazards such as unprotected heights and moving mechanical parts. However, the ALJ also found that Plaintiff can have "occasional exposure to concentrated fumes, odors, gases, dust, and poor ventilation, and she should avoid working in a loud noise environment (i.e., an SCO noise intensity level of 4 and louder)" (which Dr. McCall did not find) (Tr. 41).

that the agency doctors did not have expertise or that the ALJ relied entirely on their opinions. The ALJ, by including additional limitations, obviously relied on the medical record itself, and Plaintiff's statements, in fashioning an RFC that differed from the one advocated by the agency doctors. The ALJ further acknowledged the date of the opinions, therefore acknowledging that they did not include all the medical evidence that was then cited in the decision. The Court finds no reversible error in this assessment.

Finally, the Court finds that the ALJ sufficiently considered the Polaski factors. Social Security Ruling 16-3p eliminated the word "credibility" from the analysis of subjective complaints, replacing it with "consistency" of a claimant's statements with other evidence. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529; Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020). The Rule incorporates the familiar factors set forth in Polaski, 739 F.2d 1320, including: objective medical evidence, the claimant's work history, the claimant's daily activities; the duration, frequency and intensity of the symptoms (i.e., pain); precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. See Schwandt v. Berryhill, 926 F.3d 1004, 1012 (8th Cir. 2019). If the evidence as a whole "undermines" or "cast[s] doubt on" a claimant's testimony, an ALJ may decline to credit a claimant's subjective complaints. Id. If the ALJ explicitly discredits a claimant's subjective complaints and gives good reasons, the Eighth Circuit has held it will defer to the ALJ's judgment, even if the ALJ does not cite to Polaski or discuss every factor in depth. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

The ALJ in this case did not cite specifically to Polaski, however, he affirmatively stated he considered all of Plaintiff's symptoms based on the requirements of 20 C.F.R. § 404.1529 and

SSR 16-3p (Tr. 41). As set forth above, the ALJ summarized Plaintiff's own testimony and report regarding her limitations.

The ALJ held that, after consideration of the record as a whole, "the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are not reasonably consistent with the objective test results and physical examination findings in the longitudinal record" (Tr. 42). The ALJ supported this determination by citing to Plaintiff's treatment, in particular, the observations of her care providers, objective physical examinations, and diagnostic testing. The Court finds the ALJ appropriately discounted Plaintiff's allegations of disabling pain, fatigue, and other symptoms based on the objective medical evidence. While the ALJ may have provided more analysis, especially as to Plaintiff' statements of fatigue, the ALJ committed no reversible error. The Eighth Circuit has recently held that an ALJ "is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." Grindley v. Kijakazi, 9 F.4th 622, 630 (2021) (citation omitted). Based on the foregoing, the ALJ's decision is supported by substantial evidence in the record as a whole.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of September, 2023.